IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 25, 2021 Session

## STATE OF TENNESSEE v. VALRIE HART

**Appeal from the Criminal Court for Polk County**
**No. 17-CR-138      Sandra Donaghy, Judge**

_____

### No. E2020-01144-CCA-R3-CD

_____

The Defendant, Valrie Hart, pleaded guilty in the Polk County Criminal Court to four counts of first degree felony murder, two counts of especially aggravated robbery, a Class A felony, conspiracy to commit robbery or theft, a Class D felony, theft of property valued at more than $10,000 but less than $60,000, a Class C felony, and theft of property valued at $1,000 or less, a Class A misdemeanor. *See* T.C.A. §§ 39-13-202 (2018) (subsequently amended) (first degree felony murder), 39-13-403 (2018) (especially aggravated robbery), 39-13-401 (2018) (robbery), 39-12-103 (2018) (conspiracy), 39-14-103 (2018) (theft). After the appropriate merger, the trial court imposed life imprisonment for two counts of felony murder, twenty-five years for each count of especially aggravated robbery, and three years for conspiracy to commit robbery or theft. The trial court ordered partial consecutive service, for an effective sentence of two consecutive life sentences, plus twenty-five years. On appeal, the Defendant contends that the trial court erred by applying sentence enhancement factors related to treating the victims with exceptional cruelty and to abusing a private trust. We affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and JILL BARTEE AYERS, JJ., joined.

Steven B. Ward, Madisonville, Tennessee, for the appellant, Valrie Hart.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Renee W. Turner, Senior Assistant Attorney General; Stephen D. Crump, District Attorney General; and Shari Tayloe, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The plea agreement, the guilty plea hearing transcript, and the presentence report are not contained in the appellate record. The Defendant has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See, e.g.*, *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983). This includes the obligation to have a transcript of the evidence or proceedings prepared, including the presentence report. *See* T.R.A.P. 24(b). Despite these deficiencies, we conclude that the record is nonetheless adequate for appellate review. *See State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012) ("[W]hen a record does not include a transcript of the hearing on the guilty plea, the Court of Criminal Appeals should determine on a case-by-case basis whether the record is sufficient for a meaningful review[.]").

The record reflects that the Defendant's convictions relate to a February 28, 2017 incident, during which the Defendant fatally shot Jeremy Walker and Larry Jeffries inside the home the victims shared. The Defendant and her son, codefendant Ahren Presley, were indicted, and on January 24, 2020, the Defendant pleaded guilty as charged in the indictment. Although the State's recitation of the factual basis for the Defendant's guilty pleas is not contained in the record, the first degree murder report completed pursuant to Tennessee Supreme Court Rule 12 summarized the facts of case as follows:

> Valrie Hart and Ahren Presley are co-defendants in this double homicide case. Ms. Hart is the mother of Mr. Presley. Although indicted jointly, these cases were severed for trial. Mr. Presley took his case to a jury trial.[1] Ms. Hart waived her rights, entered pleas of guilty to all charges and was sentenced by the Court.
>
> Mr. Presley and a friend went to the home of the victims, Larry Jeffries and Jeremy Walker. Mr. Jeffries owned the home and had full-time employment. Mr. Walker is described as a young, mentally challenged man. He received SSI as a source of income. After the visit, Mr. Presley informed his mother of the "things" he saw and the two discussed committing a robbery. This discussion was confirmed by the friend, who left the restaurant where this conversation occurred.

---

[1] Codefendant Ahren Presley was convicted as charged after a jury trial. The trial court imposed an effective sentence of two consecutive life sentences, plus twenty years. Codefendant Presley has appealed his convictions and sentence, and his case is pending disposition before the Tennessee Court of Criminal Appeals. *State v. Ahren Presley*, No. E2020-01249-CCA-R3-CD (Tenn. Crim. App. Sept. 14, 2020) (notice of appeal). We take judicial notice of these proceedings pursuant to Tennessee Rule of Evidence 201.

Days later, the bodies of Larry Jeffries and Jeremy Walker were discovered in their home. The autopsy report showed that Mr. Jeffries had been shot one time in the back of the head, a close-range shot. Mr. Walker had been shot in the back and also in the back of his head. The crime scene had been manipulated in that their dogs had been confined, windows covered, and floors cleaned. Televisions, the security camera system, credit and bank cards, and Mr. Jeffries' vehicle had been stolen. Forensics showed that bullet fragments from the victims had the same characteristics as the revolver recovered.

Law enforcement tracked use of the bank cards to the defendants and their associates and collected physical descriptions, video, and other information. A credit card had been used to rent a hotel room . . . where both defendants were detained . . . and their belongings and vehicles were searched. Ms. Hart had used the credit card to buy musical equipment. The stolen vehicle was later found and traced back to this defendant.

Mr. Presley made admissions to others, but gave no statement to the police. He told a friend that Valrie shot one of the men with a gun in the head, that the bodies were not removed, but that the scene was cleaned.

In an interview with law enforcement, Valrie Hart initially admitted that she went to the home of the victims with Mr. Presley in possession of a borrowed .38 caliber revolver. The plan was to rob the victims. She stated that she heard two shots and entered the home. She and her son loaded stolen items into her car and into Mr. Jeffries' car. At her sentencing hearing, Ms. Hart admitted that she discussed with her son a plan to rob the victims. She stole a gun and they went to the house where they were invited into the home. She testified that she shot both victims in the back of the head, took items from their pockets, and stole their televisions and Larry Jeffries' car. She stated that she sold the car for drugs.

The Rule 12 report, which reflects the trial judge's signature, states that the victims had been ages fifty-two and twenty-seven and had not been "tortured" during the offenses. The report reflects that the Defendant had been the "primary assailant" because she had been the shooter and that she had been under the influence of methamphetamine at the time of the offenses.

At the sentencing hearing, the presentence report was received as an exhibit. Although the report is not contained in the appellate record, defense counsel informed the trial court that counsel and the Defendant had reviewed the report, that the defense did not dispute the "factual statements, the statistical information regarding [the Defendant], her

background, [and] her criminal history." However, the defense disputed the factual basis to support the application of enhancement factor (14) as requested by the State. *See* T.C.A. § 40-35-114(14) (2019) ("The defendant abused a position of . . . private trust . . . that significantly facilitated the commission of the offense[.]").

Rebecca Woodard, Mr. Walker's mother, testified that the victim's killing had deeply affected her family. She said that the victim had been intellectually disabled and kind-hearted. She said that the victim's father was hospitalized two weeks after the shooting because of "a nervous breakdown." She said that she, too, struggled with the victim's death because the victim had been "the special one of the family." She said that the victim had not been able to work and that he had received disability benefits, which were about $700 per month. She requested the maximum sentence to prevent the Defendant from hurting anyone in the future.

The prosecutor read a written statement prepared by Mr. Jeffries's sister. In the statement, she stated that her brother's kindness was "what ended his life." She said that the victim allowed two strangers to enter his home for the night so they "could get warm." She said that her nephew discovered the victims and that he was "devasted" by what he saw at the home. She said that her family's life had been "turned upside down," that she had nightmares about the shooting, and that she had been in constant fear. She said that her mother was "beyond devasted."

The Defendant testified that she was addicted to methamphetamine at the time of the offenses, that she had been in confinement for two years and eight months, and that during this time, she had stopped using drugs and "had gotten right with God again." She apologized for the pain she had caused the victims' families and said, "I take full responsibility for my actions no matter how heinous it was. I can never make it right."

On cross-examination, the Defendant agreed that she did not express remorse for her conduct during her presentence interview and that she had a criminal history. She said that after the present offenses occurred, she was convicted of possession of methamphetamine and possession of drug paraphernalia in Bradley County. She agreed she and codefendant Presley were together at the time of the drug-related offenses.

The Defendant testified that she and codefendant Presley discussed and planned the robbery in this case. She agreed that the victims were kind to her and that the victims invited her and her son inside. She admitted shooting the victims and said she shot Mr. Jeffries in the back of the head after Mr. Jeffries entered the home. She said that she shot Mr. Walker in the back of the head after she and codefendant Presley entered the home. She admitted stealing from the victims and said she sold the victims' belongings to another person in order to purchase methamphetamine. When asked why she traveled to Texas after the killings, she said that she did not know she was under police investigation and that

she wanted to return to her childhood home. The Defendant stated that before the killings, she fired a gun inside the home she shared with her then-boyfriend because she wanted to scare him.

The trial court found that at the guilty plea hearing, the Defendant admitted shooting the victims. The court credited the victim impact statements from the victims' family members and the Defendant's testimony. The court found that the Defendant was "competent and grounded." The court found, based upon the Defendant's testimony, that she and her son planned the robbery, that she procured the revolver from Crystal Dillard,[2] that the victims were kind to the Defendant, and that she shot the victims in the back of the head. The court stated that although it did not know how long it took the victims to succumb to their injuries, the Defendant took the victims' belongings and stole Mr. Jeffries's car and that the Defendant bought methamphetamine with the proceeds of the stolen items. The court found that the Defendant fled to Texas after the killings and that the Defendant admitted firing a gun inside a home she shared with a previous boyfriend in an effort to scare him.

The trial court reviewed the presentence report, which the court said reflected the Defendant had two drug-related convictions that occurred sixteen days after the offenses in the present case. The Defendant left high school after the tenth grade and later obtained her GED. The Defendant reported good mental health despite a bipolar diagnosis, having obsessive-compulsive disorder and depression, and having attempted suicide six years earlier. The Defendant reported using methamphetamine for thirteen years, during which she attended substance abuse treatment at "Pine Ridge" but continued to use drugs. The Defendant reported having a "stable home," although she reported her mother used marijuana and "slept around." The Defendant stated that her mother's conduct "messed her up." The Defendant had been married twice and had three children, which included codefendant Presley, and her employment history was "sporadic" because of her drug use. She received an honorable discharge from the Army after failing to pass a physical fitness test.

The trial court stated that the Strong-R assessment reflected the Defendant had a "high risk to reoffend for drugs." The court stated that the Defendant's Strong-R assessment was "high" based, in part, upon the lack of a stable home and lack of employment history.

---

[2] Other evidence shows that the Defendant and codefendant Presley traded some of the items stolen from the victims in exchange for drugs from Crystal Dillard, who was indicted along with the Defendant and codefendant Presley. Other evidence likewise shows that codefendant Dillard sold drugs to the Defendant and codefendant Presley. However, codefendant Dillard received the benefit of an immunity agreement in exchange for her testimony at codefendant Presley's trial.

The trial court determined that although confinement was required for the first degree felony murder and especially aggravated robbery convictions, confinement was likewise warranted for the remaining convictions on the grounds that it was necessary to avoid depreciating the seriousness of the offenses and that it would deter others who might commit similar offenses. *See* T.C.A. § 40-35-103(1)(B) (2019). The court found that the offenses involved the loss of life of two victims inside their home, that the victims invited the Defendant inside, that the Defendant entered with the intent to rob the victims, and that she shot the victims in the back of the head.

The trial court declined to apply any mitigating factors. *See id*. § 40-35-113 (2019). The court found that the Defendant did not express remorse for killing the victims during her presentence interview. The court acknowledged that the Defendant's "remedial actions in the jail [were] exemplary" but determined her post-arrest conduct did not warrant mitigation weight.

The trial court applied eight enhancement factors. The court applied factor (1) because the Defendant had been convicted of drug-related offenses in Bradley County since the offenses in the present case and had fired a handgun inside the home she shared with a former boyfriend, who she intended to scare. *See id*. § 40-35-114(1) (2018) ("The defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court applied factor (2) because the Defendant admitted she was the leader in the commission of these offenses, which involved her son. *See id*. § 40-35-114(2) ("The defendant was the leader in the commission of an offense involving two (2) or more criminal actors[.]"). The court applied factor (3) because the offenses involved two victims. *See id*. § 40-35-114(3) ("The offense involved more than one (1) victim[.]"). The court found that because one victim was shot in the back and in the back of the head, the evidence showed that one victim tried to flee. The court found that the Defendant committed execution-style murders after the victims opened their home to her and her son. The court likewise determined that the employee at the music store, at which the Defendant used the victims' financial information to purchase items, "was so skeptical" that the Defendant was purchasing the items with a stolen debit card that the employee noted the license plate number of the car driven by the Defendant.

The trial court applied enhancement factor (5) after determining that the Defendant "treated, or allowed a victim to be treated, with exceptional cruelty." *See id*. § 40-35-114(5). The court found that based upon the Defendant's testimony, she shot the victims in the back of the head at close range. The court found that the autopsy reports reflect that the gunshot wounds were "almost contact wounds" and that the medical examiner's testimony at codefendant Presley's trial showed the offenses were "exceptionally cruel and heinous." The court applied factor (10) because the Defendant's stealing property for drugs showed she had "absolutely no hesitation" in committing a crime when the risk to human life was high. *See id*. § 40-35-114(10). The court found that "they" only went to the

victims' home to frighten them "into giving over their stuff" but that the risk to life was high. The court likewise applied factor (12) based upon the "proof in the record" that Mr. Walker "was the victim or person other than the intended victim." *See id*. § 40-35-114(12) ("During the commission of the felony, the defendant intentionally inflicted serious bodily injury upon another person, or the actions of the defendant resulted in the death of, or serious bodily injury to, a victim or a person other than the intended victims[.]").

The trial court applied enhancement factor (14) after determining that the Defendant had violated a private trust with the victims. *See id*. § 40-35-114(14). The court acknowledged that this factor applied, generally, when a defendant has a parental or caretaking relationship with a victim. The court stated, though,

> but when you open your house to somebody who doesn't have anywhere to stay and you let them live there, that's creating a private trust. You're letting them come into your -- to your home where we all have a greatest expectation of privacy. And Mr. Presley used that . . . to see what stuff that they have. He goes and tells his mother about it and then the plan is contrived to go back to the home. So because of the victim's relationship with Mr. Presley, Ms. Hart gets access into the property and she now is in a position where she can murder. So even though she didn't even meet them before that day, she relied on the relationship that her son had developed with these men and that's an abuse of that private trust.

Last, the trial court applied enhancement factor (24) because the offenses involved a theft and because the manner in which the offense was committed resulted in the victims' suffering significant damage to their property. *See id*. § 40-35-114(24). The court applied this factor based upon evidence presented during codefendant Presley's trial, which showed that the Defendant and codefendant Presley took televisions, cut wires,[3] searched the victims' pockets, and took a car while the victims lay dying inside their home.

The trial court reviewed the statistical information published by the Administrative Office of the Courts in connection with data obtained from July 1, 2011, through June 30, 2019. The court stated that the data showed that 99% of defendants who had been convicted of a Class A felony were sentenced to incarceration, with a median sentence length of 240 months. The court stated that the data showed that Range I, standard offenders convicted of a Class D felony received a median sentence length between twenty-five to twenty-six months.

---

[3] Other evidence shows that the victims' home had a security system and that the wires to the cameras inside the home had been cut.

The trial court determined that the Defendant could maintain her sobriety and focus her life "on good things" when in confinement and that, as a result, the Defendant had a potential for rehabilitation.

The trial court merged the two felony murder convictions in connection with Mr. Jeffries and imposed a life sentence. The court merged the two felony murder convictions in connection with Mr. Walker and imposed a life sentence. The court merged the respective theft convictions with the corresponding especially aggravated robbery convictions for each victim. The court imposed a three-year sentence for conspiracy to commit robbery or theft and twenty-five years for each especially aggravated robbery conviction.

The trial court imposed partial consecutive service after determining that the Defendant was a dangerous offender. The court found that the Defendant had admitted to firing a gun in order to scare a former boyfriend and to shooting two unsuspecting victims from behind. The court found that the Defendant's behavior indicated little or no regard for human life, based upon the evidence that the Defendant entered the victims' home with a loaded gun, shot the victims, and watched them bleed to death while she and her son robbed the victims. The court found, as well, that the Defendant attempted to prevent discovery of the victims' bodies. The court determined that the circumstances surrounding the offenses were aggravated and that the killings were violent, which the court described as "near-contact" wounds. The court found that the scene was "very terrible, gross," and that the offenses were "highly aggravated, especially when one considers what they sought to gain from this was taking what little these men had and then they turn around and trade it for drugs." The court likewise found that confinement for an extended period of time was necessary to protect society from the Defendant's unwillingness to lead a productive life and from her criminal activity in furtherance of her "anti-societal" lifestyle. The court noted that the Defendant's reported employment at restaurants and as a forklift operator had not been confirmed and that the evidence showed the thirty-nine-year-old Defendant had been a drug addict for seventeen years and had murdered two people. The court found that the length of the sentences reasonably related to the severity of the conviction offenses.

Based upon these determinations, the trial court ordered consecutive service of the life sentences for felony murder and twenty-five years for one count of especially aggravated robbery, for an effective sentence of two consecutive life sentences, plus twenty-five years. This appeal followed.

The Defendant contends that the trial court erred by applying enhancement factors related to treating the victims with exceptional cruelty and to the Defendant's abusing a private trust in order to accomplish the robbery. She asserts that the record does not support the application of these factors. She does not challenge the application of the remaining

enhancement factors. The State responds that the trial court did not abuse its discretion by applying these factors.

As a preliminary matter, the Defendant states in her appellate brief that she challenges the trial court's application of two enhancement factors and the court's imposition of consecutive service. However, the arguments contained in the brief and at oral argument were limited to the court's application of the enhancement factors. As a result, our review is limited to the trial court's application of enhancement factors (5) and (14). *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived[.]").

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. §§ 40-35-102 (2018), 41-1-126 (2018) (validated risk and needs assessments).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

The record reflects that the trial court considered the evidence at the guilty plea and sentencing hearings, the presentence report, the principles of sentencing, the enhancement factors and mitigation evidence, the nature of the offenses, the statistical information provided by the Administrative Office of the Courts, the Defendant's presentence statement and sentencing hearing testimony, and the Defendant's potential for rehabilitation. The Defendant received within-range sentences for the conviction offenses. As a result, the court's determinations are afforded a presumption of reasonableness.

## A.      The Defendant Treated the Victims with Exceptional Cruelty

"[P]roper application of enhancement factor (5) requires a finding of cruelty under the statute 'over and above' what is required to sustain a conviction for an offense." *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001) (quoting *State v. Embry*, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995)). The evidence must support a finding that "the infliction of pain or suffering [is] for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as a means of accomplishing the crime charged." *State v. Kelly Haynes*, No. W1999-01485-CCA-R3-CD, 2000 WL 298744, at *3 (Tenn. Crim. App. Mar. 14, 2000). Whether a defendant treats a victim with exceptional cruelty is "a matter of degree." *State v. Terrance Maurice Moore*, No. 02C01-9306-CC-00126, 1994 WL 245481, at *2 (Tenn. Crim. App. June 8, 1994).

The record reflects that the trial court took judicial notice of the evidence presented at codefendant Presley's trial because the court's findings and determinations at the Defendant's sentencing hearing, at least in part, were based upon evidence presented at codefendant Presley's trial and were not presented as evidence at the Defendant's sentencing hearing. *See* Tenn. R. Evid. 201. The court applied enhancement factor (5) based, in part, upon the Defendant's admission at the sentencing hearing that she shot both victims in the back of the head. Mr. Walker was also shot in the back.

The trial court likewise relied upon the autopsy reports and the medical examiner's testimony at codefendant Presley's trial to determine that the killings were exceptionally cruel and heinous. However, our review of the autopsy reports and the transcript of the medical examiner's testimony at codefendant Presley's trial do not support a finding of cruelty "over and above" that which was necessary to accomplish the offenses. *See Arnett*, 49 S.W.3d at 258; *Embry*, 915 S.W.2d at 456. Although the victims were shot "execution-style" at close range from behind, the evidence does not reflect that the Defendant inflicted pain or suffering upon the victims for its own sake or for gratification, nor does the evidence reflect that the victims were subjected to mental or physical abuse before being shot. Rather, the evidence reflects that the pain and suffering inflicted upon the victims were a means of accomplishing the robbery and theft. The Rule 12 report completed in connection with the Defendant's first degree murder convictions reflects that the victims had not been tortured.

The medical examiner's testimony at codefendant Presley's trial is instructive. All three gunshot wounds showed the presence of soot and stippling, which indicated that the wounds were inflicted at close range. The head wounds were inflicted at an extremely close range, and the firearm could have touched the skin at the time it was fired. Although the gunshot wound to Mr. Walker's back was not fatal immediately, the gunshot wounds to the victims' heads would have caused immediate death. The evidence likewise does not reflect the victims suffered additional injuries associated with something other than the

gunshot wounds. Furthermore, our review of the remaining witness testimony does not reflect evidence supporting the determination that the victims were treated with exceptional cruelty before their deaths. As a result, the trial court's application of factor (5) is not supported by the evidence. However, the erroneous application of a single enhancement factor does not warrant relief because the record otherwise supports the within-range sentence imposed by the trial court, and the court applied six enhancement factors that have not been challenged by the Defendant. She is not entitled to relief on this basis.

## B. The Defendant Abused a Position of Private Trust to Accomplish the Offenses

Our supreme court has stated that in order for enhancement factor (14) to apply, courts must analyze "'the nature of the relationship' and whether that relationship 'promoted confidence, reliability, or faith.'" *State v. Gutierrez*, 5 S.W.3d 641, 646 (Tenn. 1999) (quoting *State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996)). Such relationships "usually includes a degree of vulnerability," and "[i]t is the exploitation of this vulnerability to achieve criminal purposes which is deemed more blameworthy and thus justifies application of the enhancement factor." *Gutierrez*, 5 S.W.3d at 646. Therefore, a private trust requires evidence that the relationship between a defendant and a victim "caused the victim to be particularly vulnerable," and a defendant must abuse this private trust in committing the offenses. *Id*.

The record does not reflect that the Defendant and the victims had a preexisting relationship before the day of the offenses in the present case. However, the evidence at codefendant Presley's trial reflects that that codefendant Presley and his friend, David Jaynes, were told to leave the Defendant's home sometime before the offenses. Because they needed a place to stay, Mr. Walker, who was a friend of Mr. Jaynes, invited the men to stay at the home Mr. Walker and Mr. Jeffries shared. After having stayed overnight once inside the victims' home, codefendant Presley told the Defendant about the victims' personal property, and the two devised a plan to rob them.

Likewise, at her sentencing hearing, the Defendant testified that she conspired with codefendant Presley to rob the victims, that the victims were kind to her, and that the victims invited her and her son inside the home where the killings occurred. The Defendant admitted shooting Mr. Walker after she and codefendant Presley entered the home and shooting Mr. Jeffries after he entered the home.

We conclude that record supports the trial court's application of this factor based upon the facts in the present case. Although the Defendant and the victims were not acquainted before the offenses, the victims had permitted codefendant Presley to stay at their home because he had nowhere to go. As a result of the victims' generosity and trust in codefendant Presley, he and the Defendant devised a plan to rob the victims of their personal property. The Defendant and codefendant Presley were allowed inside the home

-11-

at the time of the offenses because codefendant Presley held a trust with the victims, and that trust was extended to the Defendant because of the nature of her parental relationship with codefendant Presley. We acknowledge the evidence reflects that codefendant Presley had known the victims only for a short period of time and had stayed overnight at the victims' home only once. This nonetheless created a relationship of trust, and the relationship was exploited by the Defendant and codefendant Presley in order to gain access to the victims' home and belongings. In any event, even if application of this enhancement factor were erroneous, the record otherwise supports the within-range sentence imposed by the trial court, and the court applied six enhancement factors that have not been challenged by the Defendant. She is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE